**Cathy Arrowood WALKER, Plaintiff,**

v.

**SULLAIR CORPORATION, Defendant.**

**No. 87–215–M.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 19, 1990.

See also 127 F.R.D. 466.

95

Mark A. Michael, Charlotte, N.C., for plaintiff.

Philip Van Hoy, Charlotte, N.C., for defendant.

MEMORANDUM OF DECISION

McMILLAN, District Judge.

On May 7, 1987, plaintiff Cathy Arrowood Walker filed this suit against Sullair Corporation and Jon Lewis alleging (1) sexual discrimination in violation of Title VII

of the Civil Rights Act of 1964; (2) intentional infliction of emotional distress; and (3) malicious prosecution. On June 5, 1989, all claims against Lewis were settled and the action was dismissed as to Lewis only.

The case against Sullair was tried to the court and a jury from February 5 through February 13, 1990. (It had been mistried on a previous occasion.) The jury returned a verdict for the plaintiff on the claim of intentional infliction of emotional distress, and for the defendant on the malicious prosecution claim. The jury awarded the plaintiff compensatory and punitive damages totaling $103,500.

The Title VII claim is now ready for decision.

## FINDINGS OF FACT

From December 1, 1981, through September 2, 1986, the plaintiff was employed by defendant Sullair Corporation at its Charlotte, North Carolina business facility known as Pure Aire, Inc. Walker was hired to perform the job of receptionist and switchboard operator. Ultimately, she was promoted to the position of secretary for the sales department. The sales department consisted of two employees, the plaintiff and her immediate supervisor, Robert Bogaert.

Jon Lewis was the plant manager at Pure Aire. At all times relevant to this suit, Lewis was responsible for the overall operation of the Charlotte plant. He was not responsible for the immediate supervision of Walker, except on those days when Bogaert was out of the office.

Between 1982 and 1984, the plaintiff and Jon Lewis engaged in a sexual relationship. Lewis's recollection is that he and Walker engaged in sexual intercourse twice, while the plaintiff's recollection is that intercourse occurred four or five times over a period of two years.

The relationship began one evening after work when the plaintiff and Lewis met at a bar with several other employees. The plaintiff and Lewis had several drinks, became somewhat intoxicated, and left the bar together. They returned to the plaintiff's home and had sex. Neither on that occasion, nor on any other occasion, did Lewis promise the plaintiff job benefits or threaten the plaintiff that her job opportunities might suffer if she did not have sex with him.

On a later occasion, July 4, 1984, Lewis and the plaintiff met after work, went dancing together at a Charlotte nightclub, and left the bar separately. On that occasion the plaintiff and Lewis were not sexually intimate. That was the last time they socialized together outside the workplace.

Although Lewis was the manager of the Charlotte facility of Sullair, there is no evidence to suggest that the defendant corporation authorized or approved of Lewis's decision to have sexual intercourse with Walker or any other employee of the corporation. There is also no evidence to suggest that Sullair ratified this conduct.

In April, 1985, approximately nine months after the plaintiff and Lewis last had sex, plaintiff married for the second time.

The evidence does not show that at any time thereafter Lewis expressly importuned Walker for sexual intercourse. However, on at least one occasion the plaintiff *perceived* that Lewis wished to have sex with her. On that occasion, the plaintiff returned to her automobile after her normal working day and discovered that her windshield wiper was inoperative. She asked Lewis to assist her in repairing the windshield wiper. He accommodated her request, which she interpreted to mean he wished to have sex with her.

The plaintiff testified that at or about the time of her remarriage in April, 1985, Lewis began to treat her differently. She asserts that after her remarriage, Lewis engaged in a continuous pattern of harassment which was caused by her refusal to sleep with Lewis.

At or about the time of the remarriage, Lewis *did* begin to monitor Walker's activities more closely. For example, Lewis asked one employee to monitor the number of personal phone calls made by Walker and to keep track of the time Walker departed for and returned from lunch. Lewis

also kept a file on Walker, and he made periodic entries in the file regarding her attendance, tardiness and various performance deficiencies. The evidence also suggests that Lewis berated Walker in front of other employees for various job deficiencies.

However, Lewis treated several other Pure Aire employees poorly, and this "harassment" of Pure Aire employees by Lewis was conducted on a "sex neutral" basis.

For example, Lewis monitored closely the comings and goings of several male and female employees. In addition to the file on Walker, Lewis kept performance files on Timothy Parker, Robert Bogaert and Cynthia Schultz. Moreover, Lewis monitored the number of personal phone calls made by many employees, and several of these employees were males. Lewis also berated several male and female employees in the presence of other workers about poor job performance.

Lewis admits he did not document employee performance prior to the spring of 1985. However, Lewis kept files on many of his employees (both male and female) from the spring of 1985 until the end of his employment with the defendant. Lewis attributes his record keeping habits to events unrelated to the remarriage of Walker.

According to Lewis, he had been called to testify as a witness for Sullair in an age discrimination case against Sullair. That case began in the spring of 1985. During the preparation of that case, the defendant's lawyers requested that Lewis produce documentation of the performance deficiencies of the claimant. Lewis indicated that up to that time he had not kept records of performance deficiencies. Lewis was directed to prepare and maintain written documentation of personnel matters in the event it was needed to defend against prospective discrimination litigation. Thereafter, Lewis kept written records of personnel matters.

Walker admits that Lewis criticized her for things she actually had done. She also admits the criticism related to things about which an employer might legitimately be concerned. For example, Walker admits that she was tardy frequently, committed numerous clerical errors and engaged in excessive personal phone calls while at work.

Nevertheless, plaintiff asserts that she was harassed by Lewis to a greater extent than other Sullair employees, and that the harassment was of sexual origins. The record does not support these contentions.

For example, in early 1985, Sullair hired Robert Bogaert to serve as Marketing Manager for its Charlotte facility. Bogaert became Walker's supervisor. Almost from the start, the business and personal relationship between Bogaert and Lewis was poor. Bogaert and Lewis engaged in a jurisdictional dispute over the managerial responsibilities and reporting obligations of each other. This dispute over "turf" escalated into a memo war, in which Walker became involved as an ally of her supervisor, Bogaert.

By early summer of 1986, both Lewis and Bogaert had authored various memoranda which were critical of each other. These memos were sent to corporate headquarters in Michigan City, Indiana.

On one occasion, Walker received a favorable performance evaluation from Bogaert. Bogaert went outside the "chain of command" and wrote a memo requesting that Walker be given a long overdue job reclassification and a commensurate increase in pay. When Lewis discovered the high performance evaluation of Walker, Lewis demanded that the evaluation be downgraded. He also wrote Michigan City to oppose a raise for Walker and explained that she was "undeserving" of any upgrade in job classification. As a result, Walker was denied reclassification to the higher paying job, but after a few months she received both the pay raise (retroactively) and the job upgrade.

In the late spring or early summer of 1986, Walker's health was deteriorating. Walker and her immediate supervisor Bogaert lodged a complaint of harassment with the Human Relations Division of Sullair at corporate headquarters in Michigan City.

The complaint did not set forth any allegations of *sexual* impropriety by Lewis, but instead set forth Bogaert's and Walker's collective complaints of harassment and mistreatment by Lewis.

In response to the complaint filed by Bogaert and Walker, Sullair sent two managers, Karen Haymen and Bonnie Blackburn, from its Human Relations Division in Michigan City to investigate the complaints. Over a period of two days, they interviewed most of the employees in the Charlotte office. With the exception of Bogaert (himself a complainant) and Lola Jones (a close personal friend of Walker), the employees interviewed indicated overwhelmingly that Walker was *advantaged,* rather than disadvantaged, in her treatment by Lewis. For example, several employees testified that Lewis exhibited uncharacteristic tolerance regarding Walker's tardiness, her excessive personal phone calls, her poor attendance record and various other unbusinesslike conduct.

At the conclusion of the interviews, Haymen and Blackburn informed the plaintiff that they were unable to verify her complaints of harassment. The only remedial action suggested by Blackburn and Haymen was that Walker's desk be moved approximately ten feet so that she was no longer in Lewis's direct line of sight in the workplace.

The plaintiff left the employment of Sullair on September 2, 1986, and she has been on disability leave ever since that day. Her job was eliminated when the Charlotte Sullair office was closed in 1987.

Much of the evidence which was offered at trial related to the plaintiffs' sex life. The court has intentionally avoided recounting all of the details which were presented and, in many instances, uncontested at trial. Much of the testimony which was offered in this vein was irrelevant or cumulative for purposes of deciding the Title VII claim.

The court is aware of the decision of the United States Supreme Court in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and its treatment of prior provocative speech, dress or conduct. Applying the guidance of that decision in making its decision, the court makes the following additional findings:

1) During the approximately five years Walker was employed by the defendant, she engaged in sexual relations with at least three Sullair employees, including Jon Lewis.

2) While at work, Walker discussed freely and openly her sex life and sexual fantasies. She discussed with fellow employees what she anticipated would happen sexually on prospective dates and sometimes reported the results of those dates the next day.

3) The plaintiff also engaged in sexually suggestive telephone conversations during work hours; some of these conversations were with members of the outside sales force of Sullair.

4) On at least one occasion, Walker brought to work and displayed for her fellow employees various articles of lingerie. She described how she was planning to use these articles on a date.

5) Walker sometimes used vulgar or offensive language in the workplace. To one particular employee, she described things in sexually suggestive language and undertones for the purpose of embarrassing this employee.

## CONCLUSIONS OF LAW

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1).

The plaintiff's "compensation, terms, conditions or privileges of employment," 42 U.S.C. § 2000e–2(a)(1), were not adversely affected by the conduct of Sullair Corporation on account of discrimination because of the plaintiff's sex.

Rather, the poor treatment of the plaintiff by Sullair Corporation and its agents was for reasons other than discrimination

on the basis of sex, and such treatment did not violate Title VII of the Civil Rights Act of 1964.

The United States Court of Appeals for the Fourth Circuit and the United States Supreme Court have recognized two types of sexual harassment actionable under Title VII. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Katz v. Dole,* 709 F.2d 251 (4th Cir.1983); *Spencer v. General Electric Company,* 894 F.2d 651 (4th Cir.1990). The first type of sexual harassment is known as "offensive or hostile work environment," and the second is known as "*quid pro quo*" sexual harassment, where sexual consideration is demanded in exchange for job benefits. *Katz v. Dole,* 709 F.2d 251, 254.

■ For a plaintiff to make a *prima facie* showing of *quid pro quo* sexual harassment, he or she must show five things: (1) The plaintiff belongs to a protected group; (2) he or she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the plaintiff's reaction to the harassment affected tangible aspects of his or her compensation, terms, conditions or privileges of employment; (5) the employer knew or should have known of the sexual harassment and took no effective remedial action. *Spencer v. General Electric Company,* 894 F.2d at 658.

■ In a Title VII case, once the plaintiff establishes a *prima facie* case, an inference arises that *quid pro quo* sexual harassment has occurred. The burden of production then shifts to the defendant to demonstrate legitimate, nondiscriminatory reasons for the adverse employment decision. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the presumption of sexual harassment is rebutted by the defendant, the burden of production returns to the plaintiff to show that the defendant's proffered nondiscriminatory reasons are pretextual. *Spencer v. General Electric Company,* 894 F.2d at 659 (4th Cir. 1990). Throughout this scheme of shifting evidentiary burdens, however, the *ultimate*

burden of *persuasion* remains on the plaintiff.

■ The plaintiff has failed to satisfy her burden of proving *quid pro quo* sexual harassment.

The evidence does not support the conclusion that Walker was subject to *unwelcome* sexual conduct. She admits that the relationship began as consenting adults getting together. The court does not recall any evidence that Walker resisted any of Lewis's sexual overtures. She is therefore unable to satisfy her burden on the second element of her *quid pro quo* sexual harassment case.

The third element of her case—that the harassment complained of was based upon sex—is also missing. The court has little doubt that Walker was treated poorly by her employer. However, even under the plaintiff's own version of the facts, Bob Bogaert was "harassed" as much as she was "harassed." Similarly, the testimony of several witnesses painted a picture of Jon Lewis treating both male and female employees with contempt. The harassment was not of a sexual origin.

■ The plaintiff also has problems with the fourth element of her case—that the harassment affected tangible aspects of her employment relationship. In order to satisfy this element of *quid pro quo* sexual harassment, the plaintiff must show that her acceptance or rejection of the sexual conduct was an express or implied condition to the receipt of a job benefit or a cause of a tangible job detriment. *Spencer v. General Electric Company,* 894 F.2d 651 (4th Cir.1990).

Walker concedes that she was not discharged, and admits that she left the employ of Sullair voluntarily. She *does* claim that she was denied a promotion and a pay raise because of the harassment. However, the record is clear that it was Lewis, acting *contrary* to the express directives of the *defendant,* who failed to promote the plaintiff and raise her pay. In fact, the promotion and raise were eventually *granted,* were never held up by the *corporate employer Sullair,* and were made retroac-

tive to the date they were first sought! Therefore, the plaintiff has not demonstrated a tangible loss which can be attributed to the *defendant.*

Further, the plaintiff admits that Lewis never mentioned sex in connection with any promotion or refusal of a promotion, or any other employment benefit or detriment of any kind. Without some connection between the sexual conduct and some economic benefit or detriment, there is no case of *quid pro quo* sexual harassment. *Spencer v. General Electric Company,* 894 F.2d at 658.

The second type of sexual harassment is the hostile work environment variety. Although the plaintiff makes no claim of sexual harassment of the hostile work environment variety in her complaint, the court addresses this claim because the parties have discussed it in their trial briefs and at trial.

■ Sexual harassment based on a hostile work environment exists where there are sexual advances, fondling or a sexually suggestive workplace atmosphere that the claimant finds unwelcome. Hostile work environment is characterized by a workplace "pervaded with sexual slur, insult and innuendo, ... verbal sexual harassment, ... or extremely vulgar and offensive sexually related epithets" directed to or about an employee. *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983). To hold an employer liable for sexual harassment based on a hostile work environment, the plaintiff must show that the employer had actual or constructive knowledge of the sexually hostile working environment and took no prompt or adequate remedial action. *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987); *Katz v. Dole,* 709 F.2d at 256.

■ The plaintiff has failed to prove her case of sexual harassment based on a hostile work environment.

Her theory of recovery is that she participated in a series of intermittent, uncoerced sexual encounters with her superior, and that ten months after the affair ended she remarried and her superior began to harass her. The nature of the harassment after she remarried was in no way imbued with sexual overtones directed to or about the plaintiff.

Walker has offered no proof of an unwelcome touching or fondling. There is also no evidence of a workplace "pervaded with sexual slur, insult and innuendo." *Katz v. Dole,* 709 F.2d at 254. Rather, the conduct alleged included close monitoring of the attendance of the plaintiff, monitoring of personal phone calls, public reprimands for poor job performance and various other non-sexual harassment. In fact, the testimony which was offered at trial on this subject tended to show that the sexual banter and remarks made at the Pure Aire office in Charlotte were often *initiated* by the plaintiff herself.

The court concludes that the plaintiff has failed to make a showing of the second variety of sexual harassment—hostile work environment.

Based upon all of the evidence offered at trial the court concludes as a matter of fact that the defendant did not discriminate unlawfully against the plaintiff because of her sex.

An appropriate judgment will be entered.